# United States Court of Federal Claims
No. 09-255C
Bid Protest
(Filed Under Seal: July 16, 2009)[1]
(Reissued: July 30, 2009)

* * * * * * * * * * * * * * * * * * * * * * * * *

| | | |
|---|---|---|
| **TEXAS BIO- & AGRO-DEFENSE CONSORTIUM,** | * * * | Post-Award Bid Protest; Site Selection For Construction Of National Bio- and Agro-Defense Facility; Ripeness. |
| Plaintiff, | * * | |
| v. | * * | |
| **UNITED STATES OF AMERICA,** | * * | |
| Defendant, | * * | |
| and | * * | |
| **HEARTLAND BIO AGRO CONSORTIUM,** | * * | |
| Intervenor. | * * | |

* * * * * * * * * * * * * * * * * * * * * * * * *

T. Michael Guiffré, Patton Boggs LLP, 2550 M Street, N.W., Washington, D.C., for Plaintiff. Elizabeth M. Gill, Of Counsel for Plaintiff.

Arlene Pianko Groner, Tony West, Jeanne E. Davidson, and Steven J. Gillingham, U.S. Department of Justice, Commercial Litigation Branch, Civil Division, 1100 L Street, N.W., 8th Floor, Washington, D.C., for Defendant. Nicole Marcson and Marshall L. Caggiano, U.S. Department of Homeland Security, Of Counsel for Defendant.

Thomas P. McLish, Akin Gump Strauss Hauer & Feld, LLP, 1333 New Hampshire Ave., N.W., Washington, D.C., for Intervenor. Scott M. Heimberg, Of Counsel for Intervenor.

---

[1] The Court issued this opinion under seal on July 16, 2009, and directed the parties to file any proposed redactions to the opinion by July 20, 2009. The opinion issued today incorporates the parties' proposed redactions. This redacted material is represented by brackets "**[]**."

1

---

**OPINION AND ORDER DISMISSING COMPLAINT WITHOUT PREJUDICE**

---

**WILLIAMS**, Judge.

In this post-award bid protest, Plaintiff, Texas Bio- & Agro-Defense Consortium ("TBAC") challenges the decision of the United States Department of Homeland Security ("DHS") to select a site in Manhattan, Kansas proposed by Intervenor, Heartland BioAgro Consortium ("HBAC") for construction and operation of a National Bio- & Agro-Defense Facility ("NBAF") featuring state-of-the-art biocontainment laboratories for research and diagnosis of foreign animal and zoonotic diseases.[2] Plaintiff, a non-profit consortium of research institutions, technology and research parks, governmental entities, and corporate enterprises, submitted a proposal offering a site in San Antonio, Texas for the NBAF.[3]

Because the site selection is not yet final, as it is contingent on the negotiation of the terms of the land transfer, the action is unripe. As such, the Court dismisses the complaint without prejudice.

**Background**[4]

On January 30, 2004, President George W. Bush issued Homeland Security Presidential Directive 9 ("HSPD-9"), for the purpose of "establish[ing] a national policy to defend the agriculture and food system against terrorist attacks, major disasters, and other emergencies." R. at 000001. To this end, HSPD-9 directed the Secretaries of Homeland Security and Agriculture to "develop a plan to provide safe, secure, and state-of-the-art agriculture biocontainment laboratories that research and develop diagnostic capabilities for foreign animal and zoonotic diseases." Id. at 000004. Previously, research on such diseases was conducted at the Plum Island Animal Disease Center

---

[2] Defendant filed a submission of approximately 5400 pages entitled "Documents Relating to Jurisdiction and Standing" under seal on May 7, 2009. Defendant filed a redacted version of part of the record on May 28, 2009. Throughout this Opinion, the Court will refer to the Documents Relating to Jurisdiction and Standing collectively as the record ("R.").

HBAC consists of Kansas State University, the Midwest Research Institute, and the Kansas City Area Life Sciences Institute. R. at 002385.

[3] TBAC consists of representatives of the Southwest Foundation for Biomedical Research, Brooks City-Base, the University of Texas Health Science Center at San Antonio, and the University of Texas at San Antonio. R. at 001496.

[4] The factual background for this Opinion is derived from the record filed by Defendant, the parties' briefs and the representations of counsel during oral argument.

("PIADC"), a 50-plus year old facility off the coast of New York. Id. at 000043, 000048. The Homeland Security Act of 2002, Pub. L. 107-296, 6 U.S.C. § 190, transferred the operation of the PIADC from the Department of Agriculture to DHS. R. at 000036. However, DHS identified the PIADC as "outdated and too limited to continue to be the primary research facility." Id. at 000048. To meet its obligations under HSPD-9, DHS proposed to construct a new research facility, the NBAF, which would "house high-containment laboratories able to handle the pathogens currently under investigation at PIADC, as well as other pathogens of interest." Id. DHS intended the NBAF to "exceed both the capacity and capabilities of the Plum Island laboratories." Id. at 000051. According to a 2006 report prepared for Congress by DHS, the NBAF would:

> address biological and agricultural national security risks by co-locating scientists from several Federal agencies in a state-of-the-art biological safety containment facility. It is anticipated that existing programs at PIADC will transfer to the new facility. DHS plans to equip the NBAF with numerous laboratories that will conduct research in high-consequence biological threats involving foreign animal, zoonotic (transmitted from animals to humans), and human diseases. As a key part of this, DHS plans to house laboratories that will provide spaces for agricultural and animal studies and training. In addition, DHS plans for the NBAF to develop vaccine and other countermeasures for foreign animal diseases; and provide advanced test and evaluation capability for threat detection, vulnerability, and countermeasure assessment for animal and zoonotic diseases.

Id. at 000043. DHS predicted that the NBAF would "focus on foot and mouth disease (FMD), classical swine fever, African swine fever, Rift Valley fever, Nipah virus, Hendra virus, contagious bovine pleuropneumonia, and Japanese encephalitis" and planned to use the NBAF to "study how these pathogens enter the animal, what types of cell the disease affects, what effects the disease has on cells and animals, and how newly developed countermeasures help the animal develop protection against the disease." Id. at 000052.

**DHS' Notice Of Request For Expression Of Interest ("EOI")**

On January 17, 2006, DHS published a Notice of Request for Expression of Interest for Potential Sites for the NBAF on the Federal Business Opportunities website. Id. at 000516 to 000520. On January 19, 2007, DHS published the same Request for EOI in the Federal Register. Id. at 000102 to 000104; 71 Fed. Reg. 3,107-09 (Jan. 19, 2006). The summary in the Request for EOI stated in pertinent part:

> The U.S. Department of Homeland Security (DHS) is exploring potential sites for a proposed new national research and development (R&D) asset, the National Bio and Agro-Defense Facility (NBAF), which is in the planning phase. The proposed facility size is

> approximately 500,000 [square feet] and its site will require a minimum of 30 acres. DHS is requesting Expressions of Interest from Federal agencies, State and Local governments, industry, academia, interested parties and organizations for potential locations that would accommodate the construction and operation of the NBAF. A consortium could be an appropriate respondent.
>
> DHS will ultimately compile a short list of sites for analysis as reasonable alternatives to be considered in a National Environmental Policy Act (NEPA) Environmental Impact Statement (EIS), which will assess the environmental impacts of constructing and operating the NBAF facility at the various alternative sites.

R. at 000102 to 000103, 000516 to 000517.

The Request for EOI stated that "[a]ll viable options will be evaluated for the location of the facility (i.e., Federal government property, Federal research property, land deeded to the government, long-term lease, commercial site, etc.)." Id. at 000103 to 000518.

The Request for EOI listed four "site criteria categories" upon which DHS would "evaluate each EOI submission" -- research capabilities, workforce, acquisition/construction/operations, and community acceptance. Id. at 000103 to 000518.

**Plaintiff's Expression Of Interest**

On March 31, 2006, Texas Research and Technology Foundation -- which would later become a member of Plaintiff, TBAC -- submitted an EOI for a site at Texas Research Park in San Antonio, Texas. Id. at 001470 to 001495.[5] This EOI proposed three sites for consideration, stating that "[a]nchor consortium members will support NBAF at any location in the San Antonio area." R. at 001471.

Of the three proposed sites, Texas Research Park -- which ultimately would place second in DHS' site selection -- was located approximately four miles west of the San Antonio city limits. Id. at 001480 to 005370. The EOI stated that the proposed site **[**

**]** Id. at 001471 to 001483.

---

[5] Texas Research and Technology Foundation was described by TBAC President York Duncan as "owner of the Texas Research Park" and "a member of the [TBAC]" in a letter to Contracting Officer Glynis Fisher dated February 16, 2007. R. at 001496.

**Intervenor's Expression Of Interest**

In March 2006, HBAC submitted an EOI for the Manhattan, Kansas site, **[**


**]** Id. at 002383 to 002582. **[**


**]** Id. at 002387. **[**
**]** Id. **[**
**]** Id. at 002400.

**The First Round Of The Site Selection**

On May 24, 2006, DHS issued a Selection Plan establishing an organizational structure to conduct initial evaluations of the EOIs. Id. at 000111 to 000153. The evaluation board consisted of a Selection Authority ("SA") -- Dr. Maureen McCarthy, Director of Transition for DHS's Science & Technology Directorate -- as well as a Steering Committee, which would oversee the work of four committees that were established for the purpose of evaluating each of the four evaluation factors. Id. at 000112 to 000114.

On August 9, 2006, DHS issued a press release announcing that 18 sites had advanced to the next phase in the site selection process, including the sites proposed by Plaintiff and Intervenor. Id. at 000300 to 000301.

**The Second Round Of The Site Selection**

On December 8, 2006, DHS issued substantively identical letters to the 14 consortia whose sites had been selected for the second round of the site selection process, requesting additional information for the next evaluation phase. DHS requested from both Plaintiff and Intervenor additional information regarding title to the proposed site and an expiration date on offers, as well as a description of any in-kind contributions. Id. at 000363 to 000446.

On February 16, 2007, TBAC President York Duncan responded to DHS' request for additional information by letter, stating that **[**

**]**
Id. at 001497. TBAC's response further stated that **[**

**]** Id. at 001510.

In February 2007, HBAC provided a response to DHS' request for additional information, stating:

5

[










]

Id. at 002598.

On February 27, 2007, DHS issued a Site Selection Plan for the second round of the site selection process, naming DHS Under Secretary Jay M. Cohen as the Selection Authority for the final NBAF site selection.  Id. at 000497.

In July 2007, DHS issued a Final Selection Memorandum selecting five sites -- the Texas Research Park site proposed by Plaintiff, the Manhattan, Kansas site proposed by Intervenor, and sites in Mississippi, North Carolina, and Georgia  -- "to advance as reasonable alternatives in the Notice of Intent for the NBAF Environmental Impact Statement Process."  Id. at 000950 to 000967.[6]

**Final Site Offers**

On February 29, 2008, the Selection Authority sent letters to TBAC and HBAC requesting they "confirm the details" of their final site offers specifying their in-kind contributions and any funding contingencies.  R. at 002314 to 002323, 003613 to 003622.

On March 26, 2008, HBAC submitted its final site offer.  Id. at 003623 to 003772.  HBAC stated:

[





]

---

[6] In an addendum to the Final Selection Memorandum, issued in November 2008, the Selection Authority clarified that Plum Island was also included as a site alternative.  R. at 000976.  Though DHS did not deem it appropriate to submit a proposal on behalf of Plum Island -- a site which it already owned and managed -- the Selection Authority stated that the site was evaluated under the same criteria as those sites proposed by consortia.  Id.

6

Id. at 003623.  **[**

**]** Id. at 003650.

On March 31, 2008, TBAC submitted its final site offer, stating that **[**

**]**  Id. at 002325.  TBAC also provided a list of **[**

**]** Id. at 002328.

**The Preferred Alternative Selection Memorandum**

On December 4, 2008, DHS issued a Preferred Alternative Selection Memorandum naming the Manhattan, Kansas site as "the Preferred Alternative for identification in the NBAF Final EIS." Id. at 001189.  The Preferred Alternative Selection Memorandum stated:

> Identification of a Preferred Alternative in an EIS does not guarantee that such alternative will be the final alternative selected in the agency's Record of Decision (ROD).  Rather, selection of the Preferred Alternative serves to put the public on notice as to which alternative the agency currently favors.  The ROD, signed at least 30 days after the Notice of Availability (NOA) for the NBAF Final EIS is published in the Federal Register, documents the agency's final chosen alternative.

Id.

The Selection Authority selected the Manhattan, Kansas site as the preferred alternative because "it offered the best overall benefit to the Government based upon DHS' evaluation criteria and DHS preferences, and met the intended purpose and need to successfully site, construct, and operate the NBAF with minimal environmental impacts."  Id. at 001197.

**The Record Of Decision**

On January 16, 2009, DHS published a "Record of Decision for the National Bio- and Agro-Defense Facility Environmental Impact Statement" ("ROD") in the Federal Register. Id. at 001212 to 001227; 74 Fed. Reg. 3,065-80 (Jan. 16, 2009).  The ROD stated:

> DHS has decided to implement the Preferred Alternative identified in Section 2.6 of the NBAF Final EIS.  Implementation of this alternative would result in construction of the NBAF at the Manhattan Campus Site in Manhattan, Kansas, and initiation of the

> transition of mission activities and resources from the Plum Island
> Animal Disease Center (PIADC), located on Plum Island, New York,
> to the Manhattan Campus Site.

R. at 001212.[7]

**The NBAF Construction Solicitation**

On March 12, 2009, DHS issued solicitation number HSFLBP-09-R-00001 ("the Construction Solicitation") for the construction of the NBAF at the Manhattan, Kansas site. R. at 001232 to 001443. Receipt of offers was scheduled for May 14, 2009. Id. at 001235. The Construction Solicitation stated that the procurement would be conducted as a negotiated best value acquisition. Id. DHS intends to award the contract for construction of the NBAF in September 2009. Tr. (Apr. 24, 2009) at 5.

**Contingencies Affecting Final Site Selection**

DHS and HBAC have not yet agreed to the terms by which title of land for the site would be transferred. Although DHS intends to accept the land for the site as a donation, there has not yet been any gift of property or services in connection with the future NBAF. Def.'s Br. 13, 17. Defendant represented that "DHS has not contracted with HBAC to acquire the NBAF site nor other buildings or infrastructure. Indeed, because Congress has not authorized DHS to acquire the site and has made no appropriation for that purpose, DHS could not have entered into such a contract." Def.'s Br. 20-21.

Numerous contingencies remain which affect the terms of the potential land transfer. As Defendant represented:

> The proposed site . . . is owned by the State of Kansas for use by
> [Kansas State University], and controlled by the KSU Board of
> Regents. It has not yet been determined whether Kansas will convey
> the site and the adjacent [Biosecurity Research Institute] to DHS or
> simply allow DHS to use the land for the NBAF. . . . The
> Government has not yet reviewed the title and deed documents, and
> DHS has not yet updated its environmental baseline survey. DHS has

---

[7] Prior to publishing the ROD, DHS published several other notices in the Federal Register pertaining to the EIS upon which the ROD was later based: a "Notice of Intent to Prepare an Environmental Impact Statement," 72 Fed. Reg. 41,764-65 (July 31, 2007); a "Notice of Availability (NOA) for the Draft Environmental Impact Statement," 73 Fed. Reg. 36, 540-42 (June 27, 2008); and a "Notice of Availability (NOA) for the Final Environmental Impact Statement," 73 Fed. Reg. 75,665-67 (Dec. 12, 2008). R. at 001198 to 001199, 001202 to 001204, 001207 to 001209.

>not made any decisions about the structure of this donation and it
>remains possible this transfer will not occur.

Def.'s Br. 21 (internal citations omitted).  Since Defendant made this representation, the Kansas Board of Regents sent a proposed Memorandum of Understanding ("MOU") to DHS on June 30, 2009.  Pl.'s Suppl. Br. Regarding Ripeness, Ex. B.  In this proposed MOU, the Kansas Board of Regents stated that title would be transferred via a "proposed quitclaim deed with reversionary clause indicating the gift must be used for NBAF purposes or revert to [the Kansas Board of Regents]."  Id.  The proposed MOU further stated that "[t]his MOU will remain in effect from the time it is signed by both Parties until (1) the NBAF real estate is transferred to DHS and vacated by Kansas State University; or (2) the Parties determine the NBAF land will not be gifted."  Id.  This proposed MOU is currently being reviewed by DHS, and the gift offers have not yet been approved by the DHS Designated Ethics Agency Official.  Def.'s Suppl. Br. With Respect To Ripeness 5-6 n.4.

## Discussion

Plaintiff alleges that DHS' site selection process 1) violated the National Environmental Policy Act ("NEPA"), 2) lacked a rational basis because the risk of a release of pathogens due to tornadoes was not the same at all sites, 3) failed to properly evaluate the proposed sites in accordance with the evaluation criteria and preferences, 4) arbitrarily and capriciously evaluated the sites by utilizing the cost offset packages as an evaluation factor, 5) arbitrarily and capriciously estimated the costs to construct the NBAF at the Manhattan site, 6) arbitrarily and capriciously required the San Antonio site to withstand higher wind speeds than the Manhattan site, and 7) breached an implied-in-fact contract to consider its offer fairly.  Compl. ¶¶ 132-200.

Defendant contends that this action should be dismissed on ripeness grounds.[8]  The "basic

---

[8] Defendant and Intervenor also argue that the Court lacks jurisdiction over this action because the site selection was not a "procurement" giving rise to a bid protest.  Plaintiff submits that DHS' site selection was both a procurement in and of itself as well as a stage in a larger procurement to site, construct and operate the NBAF.  Pl.'s Br. at 3.  Plaintiff also argues that this Court has jurisdiction under Section 1491(a) because the agency breached an implied-in-fact contract to consider its proposal fairly, regardless of whether this site selection is a procurement subject to the Court's ADRA bid protest jurisdiction under Section 1491(b).  Pl.'s Reply Br. Regarding Jurisdiction 12-13.

Whether this type of a site selection is a procurement subject to this Court's bid protest jurisdiction is a matter of first impression.  Similarly, whether Section 1491(a) continues to bestow implied-in-fact contract jurisdiction over an action denominated a bid protest in the wake of ADRA has not been addressed by the Federal Circuit and is a matter of some debate among judges of this Court.  Compare Res. Conservation Group, LLC v. U.S. Dep't of Navy, 86 Fed. Cl. 475, 485 (2009), Info. Scis. Corp. v. United States, 85 Fed. Cl. 195, 205 (2008), and Lion Raisins, Inc. v. United States, 52 Fed. Cl. 115, 120 (2002) ("[N]o logical reason would support the presumption that Congress intended for the implied-contract cause of action to survive the enactment of the ADRA."),

rationale" of the ripeness doctrine "is to prevent the courts, through avoidance of premature adjudication, from entangling themselves in abstract disagreements over administrative policies, and also to protect the agencies from judicial interference until an administrative decision has been formalized and its effects felt in a concrete way by the challenging parties." Abbott Labs. v. Gardner, 387 U.S. 136, 148-49 (1967), overruled on other grounds by Califano v. Sanders, 430 U.S. 99 (1997).

To determine whether the controversy is ripe for review, the Court must examine two factors: 1) the fitness of the issues for judicial decision and 2) the hardship to the parties of withholding the Court's consideration. Abbott, 387 U.S. at 149.

**The Proposed Site Selection Is Not Fit For Judicial Review**

DHS and Intervenor have yet to complete their negotiations and execute any instrument whereby the Kansas Board of Regents would convey or donate the property for the NBAF to the Federal Government. Further, any transfer of property is contingent upon DHS' agreement to construct and operate the facility, which in turn is contingent upon Congress appropriating the requisite funding. A claim is not ripe where it rests upon "'contingent future events that may not occur as anticipated, or indeed may not occur at all.'" Thomas v. Union Carbide, 473 U.S. 568, 581 (1985) (quoting 13A Charles Alan Wright & Arthur R. Miller, Federal Practice and Procedure § 3532 (1984)). "[W]hen resolution of an issue turns on whether 'there are nebulous future events so contingent in nature that there is no certainty they will ever occur,' the case is not ripe for adjudication." Thomas v. City of New York, 143 F.3d 31, 34 (2d Cir. 1998) (quoting In re Drexel Burnham Lambert Group Inc., 995 F.2d 1138, 1146 (2d Cir. 1993)).

Because DHS and Intervenor have not yet agreed to the terms of an MOU by which title of land will be transferred to the Government, it is unclear whether transfer of the site will ultimately

---

with L-3 Commc'ns Integrated Sys., L.P. v. United States, 79 Fed. Cl. 453, 461 (2007) ("Although ADRA obviated the need to base the COFC's protest jurisdiction on a breach of this implied-in-fact contract to consider bids fairly, the statute in no way eliminated a protestor's ability to challenge arbitrary and capricious conduct . . . which would constitute a breach of the implied contract of fair dealing."), Hamilton Sundstrand Power Sys. v. United States, 75 Fed. Cl. 512, 516 (2007) ("[E]ven though bid protest jurisdiction in this court is no longer premised on a theory of an implied-in-fact contract, it is still recognized that the issuance of a competitive solicitation which generates responsive offers gives rise to an implied contract of fair dealing.") (internal quotation omitted), Future-Tec Mgmt. Sys., Inc. v. United States, No. 00-557C, slip op. at 15 (Fed. Cl. July 3, 2002), ("[T]he implied-in-fact contract theory has been subsumed, but not necessarily over-ruled, by the amendments set forth in the ADRA."), and Unified Architecture & Eng'g, Inc. v. United States, 46 Fed. Cl. 56, 60 (2000); see generally, Ralph C. Nash, The Implied Contract to Fairly and Honestly Consider an Offer: Now You See It, Now You Don't, 23 No. 2 Nash & Cibinic Report ¶ 5 (Feb. 2009) (concluding that a claim of breach of the implied-in-fact contract survives as a basis for jurisdiction in a bid protest because ADRA did not alter § 1491(a)(1)).

be a gift, a purchase, a lease, or some other form of acquisition.  See Tr. (June 8, 2009) at 85-86. Further, as Defendant points out, "[w]ithout congressional appropriation for construction funding, the NBAF will not be constructed in Manhattan, Kansas or anywhere else for that matter."  Def.'s Suppl. Br. With Respect To Ripeness at 5.  Finally, the three parties acknowledge that there is no binding commitment on either side to go forward with land transfer -- either party can walk away.

However, in their supplemental briefs on the issue of ripeness, Plaintiff and Intervenor argue that the agency's site selection decision was final at the time DHS issued the ROD.  Yet the record, as well as the parties' representations to the Court, do not support this characterization.  The Kansas Board of Regents has proposed a MOU, which is currently being reviewed by DHS -- making clear that further agency action is required to consummate the site selection.

Plaintiff relies upon Hunt Building Company v. United States, 61 Fed. Cl. 243, 246 (2004), to assert that a protest was held to be ripe even where final contract documents had not yet been executed.  However, Hunt Building is distinguishable.  In Hunt Building, the protestor filed its complaint after a selection but before contract closing.  The Court found the matter ripe because "the Air Force has represented that the transaction documents that will form the basis of the award have been finalized."  Id.  As the Court stated:

> Although the closing has yet to occur, the Air Force has represented to the Court that the form legal documents have been finalized and that the Air Force and Actus have an agreement in principle.  The Air Force's Director, Real Property Office, Office of the Deputy General Counsel for Installations and Environment, certified in a declaration that the revised form legal documents submitted to the Court in connection with this bid protest are the versions of those documents that the Air Force is prepared to execute to implement the Project.  As such, the matter is ripe for judicial review, since the actions Hunt protests have been effected -- the Successful Offeror has been selected, the post-selection finalization of the legal documents has been completed to the extent it can be and all that remains to be done is closing in accordance with those documents.  There is sufficient finality for the Court to review the action, and delaying review until the formality of a closing could impair the Court's ability to fashion relief.

Id. at 269-70 (internal citations omitted).  Conversely, the parties in the instant protest have recognized that no agreement regarding the terms of the MOU has been reached and no transactional documents have been finalized.[9]

---

[9] As an exhibit to its brief on ripeness, Plaintiff submitted a copy of the draft MOU and stated that it "appears to be the final, executed copy of the MOU from the Kansas Board of Regents." Pl.'s Suppl. Br. Regarding Ripeness 7.  However, in the same brief, Plaintiff also conceded that it

11

Intervenor properly characterized the fitness of the site selection for judicial review at the Court's July 2, 2009 hearing:

> MR. MCLISH [Counsel for Intervenor]: We have argued, and the government has argued, that the Court doesn't have jurisdiction because there is no contract. The ripeness issue is closely related to that, in that TBAC responds to the jurisdictional argument by saying, well, there might be a contract. They speculate there's a hypothetical contract out there.
>
> THE COURT: Whether there is or not, there is not yet.
>
> MR. MCLISH: There is not one today. So our argument has been, and the government's argument has been, that TBAC hasn't met its burden, as of today, as of yesterday, as of June 8th when we were here, as of the filing of the complaint, that the Court presently has jurisdiction.
>
> Now the ripeness issue, I think, is basically the same issue which is, if the response to that is, well, there might be a contract some day; our counter response to that is, well, that's not right, because this Court shouldn't get entangled in deciding the hypothetical issue of, if DHS does something different than what it says it's going to do, whether or not this Court should enjoin them from doing that.
>
> That is an issue that the Court shouldn't spend its time on, and I think the law supports that. The Abbott case that you cited specifically says, that's not what courts do.
>
> THE COURT: It's even more nebul[ous] than that. It's not even if DHS does something different than what it said it was going to do. DHS hasn't said what it's going to do, in terms of the final deal that it's structuring -- be it a contract, be it a gift, be it a lease -- definitively, yet.
>
> MR. MCLISH: I think that's right. It's unclear on the record, as it stands now, exactly what's going to happen.
>
> Now I believe that DHS fully intends to site the [NBAF] in Kansas. That's certainly my client's belief; and I believe that HBAC and

---

"does not know whether DHS has executed the MOU." Id. Because the proposed MOU is currently under review by DHS, the proposed MOU is not in final form.

> Kansas and DHS all believe that it's going to be done via a gift.
>
> Now TBAC's entire case depends on that not being the case. What I'm suggesting is that if the time comes when it's clarified what DHS is going to do, then if that's something that DHS is planning to do, and is something that falls within this Court's jurisdiction, then it's ripe for the Court to decide.

Tr. (July 2, 2009) at 22-24. Given the uncertainty of what form the potential transfer of land and in-kind contributions from HBAC to DHS may take and the multiple contingencies that may not occur as anticipated, the site selection decision is not fit for judicial review. E.g., Commonwealth Edison Co. v. United States, 56 Fed. Cl. 652, 658-59 (2003) (explaining that when "an issue is contingent upon future events that may not occur as anticipated," that issue is not ripe for review).

**Withholding Judicial Review at This Juncture Will Not Cause Hardship to the Parties**

The parties have identified no hardship resulting from the Court's withholding of judicial consideration at this time. Plaintiff asserts that it would suffer "the lost opportunity to realize substantial monetary benefits if the NBAF were built in Texas," a detriment which "also includes damage to the marketplace reputation and future business opportunities for the TBAC entities and the entire San Antonio community in the area of biomedical and agricultural research." Pl.'s Suppl. Br. Regarding Ripeness 3-4. However, these are not hardships that would stem from a dismissal without prejudice on ripeness grounds -- they are hardships which would be suffered if Plaintiff's proposed site is not ultimately selected.

Although Intervenor would prefer that the Court resolve the jurisdictional issue at this juncture, such resolution could not take into account the actual transaction which may (or may not) result from ongoing negotiations. Rather than predicate a ruling on jurisdiction on a nebulous scenario that has yet to be definitized and might not occur, the better course is to dismiss this action as unripe.

### Conclusion

1. This action is not ripe. The Clerk of Court is directed to **DISMISS** this action without prejudice.

2. The parties shall file proposed redactions to this Opinion by **July 20, 2009.**

> s/Mary Ellen Coster Williams
> **MARY ELLEN COSTER WILLIAMS**
> **Judge**